

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

IN THE MATTER OF THE APPLICATION )
OF KCP&L GREATER MISSOURI )
OPERATIONS COMPANY FOR PERMISSION )
AND APPROVAL OF A CERTIFICATE OF ) WD79550 (Consolidated with WD79551)
PUBLIC CONVENIENCE AND NECESSITY )
AUTHORIZING IT TO CONSTRUCT, ) Opinion filed:   December 20, 2016
INSTALL, OWN, OPERATE, MAINTAIN )
AND OTHERWISE CONTROL AND )
MANAGE SOLAR GENERATION )
FACILITIES IN WESTERN MISSOURI; )
)
UNITED FOR MISSOURI; OFFICE OF )
PUBLIC COUNSEL, )
)
        Appellants, )
)
    v. )
)
MISSOURI PUBLIC SERVICE COMMISSION, )
KCP&L GREATER MISSOURI OPERATIONS )
CO., AND MISSOURI DIVISION OF ENERGY, )
)
        Respondents. )

## APPEAL FROM THE PUBLIC SERVICE COMMISSION

Before Division Three:  Thomas H. Newton, Presiding Judge,
Cynthia L. Martin, Judge and Edward R. Ardini, Jr., Judge

United for Missouri, Inc., ("UFM") and the Missouri Office of the Public Counsel ("OPC")

(collectively "Appellants") appeal the Report and Order of the Missouri Public Service

Commission ("Commission") that granted KCP&L Greater Missouri Operations Company

("GMO") a certificate of convenience and necessity ("CCN") under section 393.170.[1] Although Appellants raise different points and arguments, there are primarily two issues to be addressed by this court: (A) whether the order is unlawful, *i.e.*, void *ab initio*, because the due process rights of the public were violated, and (B) whether the order is unlawful and unreasonable because the proposed pilot solar plant is not "necessary or convenient for the public service." Because we find that the Commission's decision to grant GMO's application for a CCN is not void *ab initio*, unlawful, or unreasonable, we affirm the Report and Order of the Commission.

## I.

GMO is an "electrical corporation" and a "public utility" subject to regulation by the Commission under chapters 386 and 393. GMO filed an application for a CCN to construct, own, and operate a solar electric generation facility at their "Greenwood" site in rural Jackson County, Missouri. The Missouri Division of Energy and UFM, among others, were allowed to intervene. A hearing on the application was held before the Commission. The Commission granted GMO's application in its Report and Order. UFM and OPC each filed an Application for Rehearing, and the Commission issued its order denying each. This appeal follows.[2]

The proposed solar plant is a pilot project that would provide the company with the opportunity to "gain experience and skills in operating a utility-scale solar plant with an ultimate

---

[1] All statutory references are to Revised Statutes of Missouri, 2000, as supplemented.

[2] During the pendency of this appeal, the Commission filed a motion to dismiss the consolidated appeals of OPC and UFM as moot, alleging that the rate treatment of the solar plant was addressed in GMO's most recent rate case; that the rate is presumptively reasonable under section 386.270; that OPC did not object to the rate stipulation and agreement within the time provided by the Commission and did not file an application for rehearing of that decision pursuant to section 386.500.2; and that Appellants' arguments in this case would amount to a collateral attack of the Commission's rate decision, which is prohibited under section 386.550. Without specifically addressing these claims, we note that the stipulation filed in the rate case does not specifically reference the Greenwood solar plant. Thus, we do not find the Commission's motion to dismiss to be meritorious and will not proceed with any further substantive review of its argument that the appeal before this court is moot.

goal of increasing GMO's use of solar power." The plant is not needed to serve GMO's current customers but will provide an additional three megawatts of electrical power. Because of the plant's small size, GMO would not be able to discontinue the use of any of its nonrenewable electric generation sources, but it would offset an estimated 5,000 tons of carbon dioxide that would otherwise be emitted by a coal-fired plant.

The cost of the proposed solar plant is small relative to GMO's current rate base and its $180 million in annual capital expenditures. GMO intends to pay the cost of the solar plant from its available funds but ultimately recover those costs from its ratepayers. The ratepayers would benefit from the federal Investment Tax Credit, which would offset thirty percent of the plant's cost. Additional facts are set forth throughout the opinion.

## II.

UFM raises two points on appeal, first alleging that the Commission's Report and Order is unlawful and then alleging that the Report and Order is unreasonable, while OPC combines both issues into a single point. Because several points and arguments overlap, we will address in a consolidated manner the following issues necessary to resolve the matter on appeal: (A) whether the order is unlawful, *i.e.*, void *ab initio*, because the due process rights of the public were violated, and (B) whether the order is unlawful or unreasonable because the plant is not "necessary or convenient for the public service."

### A. Due Process

OPC alleges that the Commission's order is unlawful because the Commission violated the due process rights of the public. Specifically, OPC draws attention to the following: the Commission did not require the parties to submit prefiled written testimony pursuant to its standard

3

process, and the parties were given only ten business days from the Commission's scheduling order to prepare for the hearing.

In an administrative proceeding, "[d]ue process is provided by affording parties the opportunity to be heard in a meaningful manner. The parties must have knowledge of the claims of his or her opponent, and have a full opportunity to be heard, and to defend, enforce and protect his or her rights." *Harter v. Pub. Serv. Comm'n*, 361 S.W.3d 52, 58 (Mo. App. W.D. 2011) (citations and inner quotation marks omitted). The authority of the Commission as well as the procedures and rules it follows are set out in chapter 386 and 4 CSR 240-2.010 *et seq*. *See id*. at 59.

OPC complains that the parties were not required to submit prefiled written testimony and were given only ten business days to prepare for the hearing before the Commission. As to the Commission's decision to not require that testimony be prepared in advance, 4 CSR 240-2.130(9) provides that "the [C]ommission . . . may direct that testimony be taken live rather than prepared in advance." As to the requirements related to hearing notice, 4 CSR 240-2.110(1) provides that "[t]he [C]ommission shall set the time and place for all hearings and serve notice as required by law." Section 386.390.5 requires ten days' notice prior to a hearing, four days less than the notice provided to the parties here. Thus, the Commission followed established rules and procedures relating to evidence and hearing notice.

More generally, the parties were given the opportunity to be heard in a meaningful manner—they had knowledge of the claims before the hearing notice was issued and, despite the lack of prepared testimony, a full opportunity to be heard and defend, enforce, and protect their rights at the hearing. *See id*. at 58. The record on appeal reveals that the parties engaged in discovery, including the depositions of witnesses; presented a Non-Unanimous Stipulation of

4

Agreed Upon Facts; filed written position statements regarding the joint list of issues; made opening statements; presented and cross-examined witnesses; offered rebuttal testimony; and filed written briefs at the conclusion of the case. The due process rights of the public were not violated by the Commission's decision to not require that testimony be prepared in advance nor because only ten business days' notice was provided prior to the hearing.

## B. Necessary or Convenient

The next issue to be reviewed is whether the Commission's Report and Order is lawful and reasonable.

### 1. Standard of Review

Pursuant to section 386.510, the appellate standard of review of a [Commission] order is two-pronged: first, the reviewing court must determine whether the [Commission]'s order is lawful; and second, the court must determine whether the order is reasonable. The burden of proof is upon the appellant to show that the order or decision of the [Commission] is unlawful or unreasonable. The lawfulness of [the Commission's] order is determined by whether statutory authority for its issuance exists, and all legal issues are reviewed *de novo*. An order's reasonableness depends on whether it is supported by substantial and competent evidence on the whole record, and the appellate court considers the evidence together with all reasonable supporting inferences in the light most favorable to the Commission's order. The Commission's factual findings are presumptively correct, and if substantial evidence supports either of two conflicting factual conclusions, the Court is bound by the findings of the administrative tribunal.

*State ex rel. AG Processing, Inc. v. Pub. Serv. Comm'n*, 120 S.W.3d 732, 734-35 (Mo. banc 2003) (citations and inner quotation marks omitted). The "findings of the Commission are [*prima facie*]" lawful and reasonable, and the burden is on the appellant to prove the order is invalid. *State ex rel. Intercon Gas, Inc. v. Pub. Serv. Comm'n*, 120 S.W.3d 732, 597 (Mo. App. W.D. 1993).

### 2. Discussion

Both Appellants allege that the Commission's Report and Order is unlawful because GMO did not meet its burden to prove that the solar plant is necessary or convenient for the public

5

service, and the Commission's Report and Order is unreasonable. UFM alleges that the Commission's decision is unreasonable, or not based on substantial and competent evidence and thus arbitrary and capricious, because it was based solely on unsupported public opinion, political, and public policy speculation rather than a demonstrated public need. OPC argues that (1) the internally inconsistent manner in which the Commission addressed the evidence renders its order arbitrary and capricious, and (2) the Commission abused its discretion because there is no competent and substantial evidence to support its decision. Appellants also both argue that speculative evidence cannot be "substantial and competent."

### a. Legal Background

"The lawfulness of [the Commission's] order is determined by whether statutory authority for its issuance exists, and all legal issues are reviewed *de novo*." *AG Processing*, 120 S.W.3d at 734 (citations omitted). Section 393.170.3 provides: "The [C]ommission shall have the power to grant the permission and approval [to construct an electric plant] whenever it shall after due hearing determine that such construction . . . is necessary or convenient for the public service."

There is no dispute that the Commission has the lawful authority under section 393.170.3 to grant a CCN to construct an electric plant after holding a hearing and finding that the plant is necessary or convenient for the public service. *See AG Processing*, 120 S.W.3d at 735 (providing similar analysis of section 393.190.1). Having found that section 393.170.3 provides the lawful authority for the Commission's decision, this court must examine its reasonableness. *See id*. Reasonableness turns on the standard in section 393.170.3, which is whether or not the construction is "necessary or convenient for the public service." *See id*.

"The determination of what is necessary and convenient has long been, and continues to be, a matter of debate." *State ex rel. Pub. Water Supply Dist. No. 8 v. Pub. Serv. Comm'n*, 600

6

S.W.2d 147, 154 (Mo. App. W.D. 1980). Specific criteria have not been set out by statute as to when a certificate is "necessary or convenient for the public service" and thus should be issued. *State ex rel. Ozark Elec. Co-op v. Pub. Serv. Comm'n*, 527 S.W.2d 390, 394 (Mo. App. 1975). Instead, whether "the evidence indicates the public interest would be served in the award of the certificate" is within the discretion of the Commission. *Intercon Gas*, 848 S.W.2d at 597-98.

Although specific criteria for the Commission's consideration have not been set out by statute, guidance can be found in past court opinions. For example, Missouri courts have stated that "'necessity' does not mean 'essential' or 'absolutely indispensable', but that an additional service would be an improvement justifying its cost." *Id*. at 597 (citation omitted); *see also Pub. Water Supply*, 600 S.W.2d at 154; *State ex rel. Mo. Coach Lines v. Pub. Serv. Comm'n*, 179 S.W.2d 132, 136 (Mo. App. 1944). In other words, "[a]ny improvement which is highly important to the public convenience and desirable for the public welfare may be regarded as necessary. If it is of sufficient importance to warrant the expense of making it, it is a public necessity." *Mo. Coach Lines*, 179 S.W.2d at 136 (citation and inner quotation marks omitted).

The purpose of the Commission also provides guidance to the court. The Commission was designed "to substitute regulated monopoly for destructive competition. The spirit of this policy is the protection of the public. The protection given the utility is incidental." *State ex rel. Electric Co. of Mo. v. Atkinson*, 204 S.W. 897, 899 (Mo. banc 1918). The Commission's powers to regulate in the public interest "are broad and comprehensive" and include the authority "to order improvements[.]" *Stopaquila.Org v. Aquila, Inc.*, 180 S.W.3d 24, 34-35 (Mo. App. W.D. 2005) (citations and inner quotation marks omitted).

As stated above, this court is guided by the following when considering whether an order of the Commission is reasonable:

7

An order's reasonableness depends on whether it is supported by substantial and competent evidence on the whole record, and the appellate court considers the evidence together with all reasonable supporting inferences in the light most favorable to the Commission's order. The Commission's factual findings are presumptively correct, and if substantial evidence supports either of two conflicting factual conclusions, the Court is bound by the findings of the administrative tribunal.

*AG Processing*, 120 S.W.3d at 734-35 (citations and inner quotation marks omitted).

### b. Analysis

Appellants' argue that the Commission's decision was unreasonable because it was based on future needs and benefits and such evidence is not substantial and competent. "However, in matters of public convenience and necessity there must be consideration of the future." *Ringo v. Pub. Serv. Comm'n*, 132 S.W.2d 1080, 1082 (Mo. App. 1939); *see also State ex rel. Gulf Transport Co. v. Pub. Serv. Comm'n*, 658 S.W.2d 448, 458 (Mo. App. W.D. 1983). Consideration of the future should be "part of a *comprehensive* evaluation of whether the public convenience and necessity would be served[.]" *Gulf Transport*, 658 S.W.2d at 458 (emphasis added). An applicant does not meet its burden of proof "by mere speculation, guesswork, hopes[,] or aspirations[,]" however, and a present need must be established. *Id.* (citation and inner quotation marks omitted); *see also State ex rel. Oliver v. Pub. Serv. Comm'n,* 542 S.W.2d 595, 598 (Mo. App. 1976). Because the future must be part of a comprehensive evaluation in matters of public convenience and necessity, we will not disregard this evidence in our review of the whole record to determine whether the Commission's order was reasonable.

Although Appellants' respective arguments are structured differently, both generally argue four reasons that the solar plant is not necessary or convenient for the public service: (1) the plant is not needed to serve GMO load, (2) the plant costs in excess of reasonable alternatives, (3) the

8

plant is not needed to comply with environmental regulations, and (4) the plant protects the utility rather than the public.

### *Load and Cost*

In support of their arguments that the plant is not needed to serve GMO load and the improvement does not justify the cost, Appellants heavily rely on cases such as *Intercon Gas* and *Pub. Water Supply*. Although their briefs differ slightly, Appellants generally assert that the solar plant is not necessary, or an improvement justifying the cost, because there is not some "failure, breakdown, incompleteness[,] or inadequacy in the existing regulated facilities" and there are lower cost alternatives. *Pub. Water Supply*, 600 S.W.2d at 155 (citation and inner quotation marks omitted) (evidence showed current water utility could not provide adequate fire protection service or extend water service without additional facilities); *see also State ex rel. Webb Tri-State Gas Co. v. Pub. Serv. Comm'n*, 452 S.W.2d 586, 589 (Mo. App. 1970) (new technology at lower price amounted to necessity). Appellants also argue that the desire for other facilities or services itself does not establish a need. *See People's Tel. Exch. v. Pub. Serv. Comm'n*, 186 S.W.2d 531, 536 (Mo. App. 1945) (quoting the Commission's Report and Order); *see also Gulf Transport*, 568 S.W.2d at 460 (finding a *prima facie* showing of public need where evidence showed desire for services *and* rates below those offered by protestants). They add that "what is necessary and convenient encompasses regulation of monopoly for destructive competition, prevention of undesirable competition, and prevention of duplication of service." *Intercon Gas*, 848 S.W.2d at 597 (citing *Pub. Water Supply*, 600 S.W.2d at 154).

Appellants' substantial emphasis on considerations such as "failure, breakdown, incompleteness[,] or inadequacy in the existing regulated facilities" is misplaced. *See Pub. Water Supply*, 600 S.W.2d at 154 (citation and inner quotation marks omitted). These considerations have

9

typically been applied in factually distinct cases wherein a CCN is being sought by a utility provider attempting to enter the existing service area of another utility provider or to extend service to a new area. *See, e.g.*, *id*. (application for CCN where current water district not providing adequate service). Here, GMO is not competing with another utility or attempting to expand into a new service area but instead desires to provide improved service to its customers in its current service area.

Nevertheless, Appellants argue in light of these cases that GMO's facilities are not inadequate because the Commission found that "GMO does not need an additional three megawatts of generating capacity to meet the energy requirements of its customers at this time."[3]

Additional findings of the Commission, however, support a conclusion that GMO's current facilities are not complete or adequate. Although its current facilities may be sufficient to serve GMO's present load needs, the Commission found that "GMO wants to build the solar plant to gain experience and skills in operating a utility-scale solar plant with the ultimate goal of increasing GMO's use of solar power." GMO's need to gain experience operating a solar plant is further supported by the Commission's finding that GMO "currently does not have a utility-scale solar facility."[4] The solar plant proposed by GMO is "different than GMO's other generation sources, including its wind sources," in that it "will be connected to a single circuit at the distribution level[.]" The Commission noted several lessons that GMO expects to learn from operating the proposed solar plant, including:

- Experience in designing an interconnection facility for a utility-scale solar plant;

---

[3] Quotations without citations are to the Commission's Report and Order.

[4] GMO's sister company, Kansas City Power & Light, currently operates two facilities that "are much smaller than three megawatts" for single large customers that are connected at the secondary level at those locations.

10

- Advantages to locating a solar plant next to an existing generating facility and whether workers can be cross-trained to manage and maintain both facilities;

- Impacts a solar plant would have on the company's distribution system, including voltage and system stability; and

- Understanding solar energy production under weather conditions in GMO's service territory.

Thus, it is not unreasonable to conclude that GMO's facilities as they currently exist are not adequate to meet the increase in customer solar-based demand reasonably anticipated to result from the decreasing costs of solar energy in the next few years. Although the proposed pilot plant will provide GMO with valuable experience, the ultimate benefit will be to GMO's customers because GMO will be better positioned to meet their solar-based demands.

Appellants next argue that the solar plant is not an improvement justifying its cost because the Commission found that the "utility-scale solar plant is not the least-cost alternative for obtaining an additional three megawatts of energy" and that "[w]ind energy and fossil fuel generation would be less costly, even when taking into account the cost to comply with environmental regulations." Appellants also take issue with the findings that GMO will ultimately seek to recover the costs of the solar plant from its ratepayers.

The Commission acknowledged in its Report and Order that solar power "is not the least-cost option at this time[,]" but other findings provide reasoning as to why the proposed project is nevertheless an improvement justifying its cost. The Commission found that although the calculation of OPC's witness, an economist, "showed that the savings from waiting until 2020 to build this solar plant would appear to be significant when measured on a per megawatt hour per year basis[,]" "the actual total cost savings resulting from the delay are not significant when compared to GMO's total annual revenues" due to the small size of this solar project. The Commission made a related finding that "[t]he cost of the project is small relative to [GMO's rate

11

base of] $1.4 billion . . . and in relation to the $180 million in annual capital expenditures made by the company." Further, "GMO will [ ] be able to take advantage of the federal Investment Tax Credit to offset thirty percent of the cost of the project."[5]

The Commission also found that "it is anticipated that [solar energy] costs will continue to drop in the next few years to bring it into parity with alternative sources of renewable energy. Witnesses for Staff and [OPC] agreed that the cost of solar power would decrease in future years." The coming price parity, "rather than being a cause for delay, [ ] is a cause for GMO to act now." In support, the Commission explained that "[a]s the price of solar power decreases there is a possibility that third parties may construct a community solar system that will need to be incorporated into GMO's system." Therefore, "GMO would likely benefit from learning its lessons about how to integrate solar into its system now rather than a few years[.]" This pilot project is thus reasonable and necessary for GMO to prepare to meet the expected increase in customer demand for solar energy following the coming price parity.

### Regulations and Policy

Appellants also argue that the plant is not necessary or an improvement justifying its cost because GMO is already compliant with current environmental regulations. In support, Appellants rely on the Commission's findings that "GMO does not need to add this solar plant to meet Missouri's current [Renewable Energy Standard] ["RES"]" and "nearly everything about the [federal Environmental Protection Agency's] Clean Power Plan ["CPP"] is still uncertain."

With regard to environmental regulations, the Commission found that although GMO is compliant with Missouri's RES, "GMO's greatest need for additional solar production at this time

---

[5] The Commission further found that "GMO's ratepayers will benefit from the tax credit when that credit is claimed in the company's tax return. The credit would reduce the company's tax liability, and the reduced tax liability reduces the revenue requirement that the company would otherwise recover from ratepayers."

12

may be its need to comply with the [CPP.]" Although the CPP has been stayed while under judicial review, the Commission specifically found that "GMO reasonably believes the [CPP] will likely remain in some form and, therefore, it is prudent for the company to continue to plan for how it will comply with that rule." "The [CPP] as it currently exists would require GMO to reduce its carbon production by up to [thirty-seven] percent. GMO will need to diversify its generation portfolio by adding wind, energy efficiency[,] and additional solar power to meet those requirements."

The Commission also found that "the stay of the compliance portion of the rule might delay the submission of a state plan to implement the CPP and thereby shorten the available time for GMO to plan how it will meet the requirements of the state plan." "The regulation requires compliance with reduced carbon levels beginning in 2022." The Commission's consideration of GMO's need to prepare for the requirements of the CPP is both appropriate and reasonable. Importantly, the reasonableness is further buttressed when the relatively small cost of this pilot project is also considered.

Appellants also seek support by reference to the policy underlying the creation of the Commission. In particular, they argue that the Commission's focus must be to protect the public, such that any "protection given the utility is incidental." *Atkinson*, 204 S.W. at 899. The Missouri Supreme Court has explained that the Commission takes the place of and stands for competition by regulating the utilities in order to prevent economic waste, supervising features of the business that will ultimately be "reflected in rates and quality of service." *Pub. Serv. Comm'n v. KCP&L Co.*, 31 S.W.2d 67, 69 (Mo. banc 1930).

Appellants assert that the Commission's decision goes against this policy because the cost is unnecessary and thus fails to protect captive customers. Appellants' effort to cast this project

solely as a benefit to GMO is fundamentally flawed in that it again ignores the pilot project's relatively small size and cost and the improvements that will inure to GMO's customers from the lessons learned through the operation of this facility and the resulting preparation for solar energy integration.

Moreover, Appellants fail to acknowledge that the same cases they generally rely on also emphasize "a necessity for the conservation of energy and of natural resources." *Pub. Water Supply*, 600 S.W.2d at 154 (citing *Atkinson*, 204 S.W. at 898-99) (inner quotation marks omitted). The public policy of the state to conserve natural resources and pursue renewable energy sources is reflected in Missouri's RES. *See Moorshead v. United Rys. Co.*, 96 S.W. 261, 271 (Mo. App. 1906) ("[T]he very highest evidence of the public policy of any state is its statutory law").

Although GMO is compliant with Missouri's RES, the Commission additionally found that "GMO's customers have shown their enthusiasm for solar power by collecting $50 million in solar rebates" made available through the act. Moreover, GMO is not the first electric company "to pursue solar power as a renewable alternative to coal-based electric generation[.]" "In 201[4], the Commission approved a similar solar plant in O'Fallon, Missouri[,] to be operated by Union Electric Company, d/b/a Ameren Missouri."[6]

The numerous findings of the Commission in its Report and Order, including those discussed herein, are supported by citations to the parties' Stipulation of Agreed Upon Facts and the hearing transcript that spans hundreds of pages. In sum, there is substantial and competent evidence on the record as a whole to support the Commission's findings and ultimate conclusion that the solar plant is "necessary or convenient for the public service" as required by section 390.170.3.

---

[6] The Commission's findings incorrectly state that the Commission approved a similar solar plant in *2015*. A review of the record on appeal reveals that the order for the referenced plant was issued in *2014*.

14

*Conclusion*

The Commission's findings acknowledged the facts raised by Appellants that the plant is not currently needed to supplement its load capacity, is not the least-cost alternative, and is not needed to comply with current environmental regulatory requirements. However, after proper consideration to these facts, the Commission reached several conclusions, including that the solar plant is (1) an improvement justifying its cost; (2) in the public interest; and (3) necessary and convenient for the public service. *See Intercon Gas*, 848 S.W.2d at 597-98; *Pub. Water Supply*, 600 S.W.2d at 153-54. The Commission's decision that the solar plant is an improvement justifying its costs is reasonable in that, generally stated, it is supported by the Commission's findings that GMO's goal with the pilot project, which is "relatively small" when compared to GMO's rate base and annual capital expenditures, is to gain experience and skills in operating a utility-scale solar plant so that GMO is prepared to serve its customers as the use of solar power increases as costs of such energy decreases in the near future. The Commission's conclusion that the solar project is in the public interest is also reasonable in light of its findings that the CPP will remain effective in some form, Missouri's demonstrated public policy of conserving natural resources and pursuing renewable energy sources, and the public's demonstrated interest in solar power, which includes the Commission's specific and relevant finding that GMO's own customers have aggressively taken advantage of Missouri's RES solar rebates. Because solar power and thus the solar plant "is highly important to the public convenience and desirable for the public welfare[, it] may be regarded as necessary" and of sufficient importance to warrant the expense. *See Mo. Coach Lines*, 179 S.W.2d at 136.

Viewing the evidence and all supporting inferences in the light most favorable to the Commission's decision, we find that there is substantial and competent evidence on the record as

a whole to support the decision that the proposed pilot solar plant is "necessary or convenient for the public service" as required by section 393.170. *See AG Processing*, 120 S.W.3d at 734-35. GMO's present need to gain experience with solar power is ultimately not for its own gain but for its customers' benefit, and Missouri's existing public policy to pursue renewable resources such as solar energy has been supported by GMO's customers. Because statutory criteria have not been set forth and what is necessary and convenient continues to be a matter of debate, the underlying public interest is the controlling concern and "it is within the discretion of the . . . Commission to determine when the evidence indicates the public interest would be served in the award of the certificate." *See Intercon Gas*, 848 S.W.2d at 597-98 (citation omitted); *Pub. Water Supply*, 600 S.W.2d at 154 (citation omitted). The Commission's conclusions that the solar plant is an improvement justifying its cost and is in the public interest are supported by substantial and competent evidence on the record as a whole; thus, its decision that the solar plant is necessary and convenient for the public service is both lawful and reasonable.

### III.

Because we find that this appeal is not moot and the PSC's decision to grant GMO's application for a CCN is not void *ab initio*, unlawful, or unreasonable, we affirm the Report and Order of the Commission.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

16