

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

IN THE MATTER OF THE AMENDMENT )
OF THE COMMISSION'S RULE REGARDING )
APPLICATIONS FOR CERTIFICATES OF )
CONVENIENCE AND NECESSITY; KANSAS )
CITY POWER AND LIGHT AND KCP&L )
GREATER MISSOURI OPERATIONS )
COMPANY, )
                 )
           Appellants, )
                 )
v. )    WD82182
                 )
MISSOURI PUBLIC SERVICE COMMISSION )    Opinion filed: June 28, 2019
AND DOGWOOD ENERGY, )
                 )
           Respondents. )

## APPEAL FROM THE PUBLIC SERVICE COMMISSION

Before Division Three: Thomas H. Newton, Presiding Judge,
Anthony Rex Gabbert, Judge and Edward R. Ardini, Jr., Judge

Kansas City Power & Light Company ("KCP&L") and KCP&L Greater Missouri Operations Company ("GMO") appeal an Order of Rulemaking issued by the Public Service Commission ("PSC") adopting a new rule relating to certificates of convenience and necessity. KCP&L and GMO argue that the rule exceeds statutory authority, and further that the rule's fiscal note is deficient, rendering the rule void and unenforceable. We agree that the rule exceeds statutory authority, and therefore vacate the Order of Rulemaking.

**Factual and Procedural Background**

"The PSC is a state agency established by the Missouri General Assembly to regulate public utilities operating within the state." *State ex rel. Praxair, Inc. v. Mo. Pub. Serv. Comm'n*, 344 S.W.3d 178, 186 (Mo. banc 2011). KCP&L and GMO are electrical corporations and public utilities as defined in section 386.020,[1] subject to regulation by the PSC. Dogwood Energy, LLC ("Dogwood") owns a majority interest in the Dogwood Energy Facility, "a natural gas-fired, combined cycle electric power generating facility" located in Missouri. The Dogwood Energy Facility is the "largest combined cycle plant in the state."

The PSC is vested with rulemaking authority under section 386.250.[2] On April 5, 2018, the PSC filed a proposed rule with the Missouri Secretary of State regarding electric utility[3] applications for certificates of convenience and necessity ("CCNs"). The PSC sought to rescind the then-existing rule regarding applications for CCNs—4 CSR 240-3.105—and replace it with a new rule, the provisions of which are discussed in detail below. The proposed rule contained a statement that it would "not cost private entities more than five hundred dollars ($500) in the aggregate." Comments in support of or in opposition to the proposed rule were accepted until June 14, 2018, and a public hearing regarding the proposed rule was held on June 19, 2018.

---

[1] All statutory references are to RSMo 2016, as amended, unless otherwise noted.

[2] The powers of the PSC extend to "the adoption of rules as are supported by evidence as to reasonableness and which prescribe the conditions of rendering public utility service, disconnecting or refusing to connect public utility service and billing for public utility service." § 386.250(6). "All such proposed rules shall be filed with the secretary of state and published in the Missouri Register as provided in chapter 536, and a hearing shall be held at which affected parties may present evidence as to the reasonableness of any proposed rule[.]" *Id.*

[3] Although Chapter 386 defines the terms "electrical corporation" and "public utility," *see* § 386.020, the rule that is the subject of this appeal uses the term "electric utility." We use these terms interchangeably.

KCP&L, GMO, and Dogwood submitted written comments to the PSC, and KCP&L and GMO appeared at the hearing to express their positions on the proposed rule.[4] KCP&L and GMO generally opposed the proposed rule; Dogwood generally supported it. On August 8, 2018, the PSC filed two "Orders of Rulemaking" with the Secretary of State: one rescinding 4 CSR 240-3.105 and one adopting 4 CSR 240-20.045 ("the Rule"). The Order of Rulemaking adopting the Rule set forth the provisions of the Rule, summarized and responded to the comments that had been submitted regarding the proposed rule, and included a fiscal note, which estimated that compliance with the Rule "would result in an additional cost of $0 to $100,000" for private entities.

KCP&L and GMO filed a timely Application for Rehearing and Request for Stay, asserting that the PSC "should rehear this matter, and thereafter revoke and rescind its Order of Rulemaking." The PSC denied the request, and KCP&L and GMO appealed to this Court. *See* § 386.510 (orders of the PSC are directly appealable to "the appellate court with the territorial jurisdiction over the county where the hearing was held or in which the commission has its principal office"). Dogwood moved to intervene as a respondent in the appeal; we granted Dogwood's request. The Rule was published in the Missouri Register on October 15, 2018, and became effective on November 30, 2018.

Additional facts are set forth in our analysis.

## Standard of Review

"[T]he standard of review of a PSC order of rulemaking is two-pronged: first, the reviewing court must determine whether the PSC's order is lawful; and second, the court must determine whether the order is reasonable." *State ex rel. Atmos Energy Corp. v. Pub. Serv. Comm'n*, 103 S.W.3d 753, 759 (Mo. banc 2003); *see also* § 386.510. To be lawful, the order of rulemaking "must

---

[4] PSC staff, the Office of the Public Counsel, and private entities that are not parties to this appeal also submitted comments and appeared at the public hearing. Dogwood did not attend the public hearing.

3

be consistent with and subject to statutes adopted by the General Assembly." *See State ex rel. Philipp Transit Lines, Inc. v. Pub. Serv. Comm'n*, 523 S.W.2d 353, 356 (Mo. App. 1975); *see also State ex rel. Sprint Mo., Inc. v. Pub. Serv. Comm'n*, 165 S.W.3d 160, 163 (Mo. banc 2005) (The lawfulness of the PSC's order "turns on whether the PSC had the statutory authority to act as it did."); § 536.014. When determining whether an order of rulemaking is lawful, "we exercise independent judgment and must correct erroneous interpretations of the law." *State ex rel. Pub. Counsel v. Pub. Serv. Comm'n*, 397 S.W.3d 441, 447 (Mo. App. W.D. 2013). "There is no presumption in favor of the Commission's resolution of legal issues" and "we decide the legal points anew." *Atmos Energy Corp.*, 103 S.W.3d at 759. If we find the PSC's order of rulemaking unlawful, we need not reach the issue of reasonableness. *In re Verified Application & Petition of Liberty Energy (Midstates) Corp.*, 464 S.W.3d 520, 524 (Mo. banc 2015).

### CCN Law and the Rule

KCP&L and GMO raise four points on appeal. Before we address these points, however, we believe it helpful to set forth some general law regarding CCNs, along with the relevant provisions of the Rule.

Section 393.170 requires that an electrical corporation obtain a CCN from the PSC before the corporation can take certain actions. Specifically, subsection 1 provides that, "[n]o . . . electrical corporation . . . shall begin construction of a[n] . . . electric plant . . . other than an energy generation unit that has a capacity of one megawatt or less, without first having obtained the permission and approval of the commission." § 393.170.1. Subsection 2 provides that, "[n]o such corporation shall

4

exercise any right or privilege[5] under any franchise[6] . . . without first having obtained the permission and approval of the commission." § 393.170.2. Finally, subsection 3 provides that:

> The commission shall have the power to grant the permission and approval herein specified whenever it shall after due hearing determine that such construction or such exercise of the right, privilege or franchise is necessary or convenient for the public service. The commission may by its order impose such condition or conditions as it may deem reasonable and necessary. Unless exercised within a period of two years from the grant thereof, authority conferred by such certificate of convenience and necessity issued by the commission shall be null and void.

§ 393.170.3.

In other words, "[s]ection 393.170 sets out two types of CCNs the Commission may grant a utility." *Grain Belt Express Clean Line, LLC v. Pub. Serv. Comm'n*, 555 S.W.3d 469, 471 (Mo. banc 2018). "These types are provided for in separate subsections of section 393.170 and are commonly referred to as '*line* certificates' and '*area* certificates.'" *Id.* (emphasis in original). "Section 393.170.1 grants the Commission the authority to issue a line CCN to a utility to construct electrical plants." *Id.* Additionally, "[p]ermission to build transmission lines or production facilities is generally granted in the form of a 'line certificate.'"[7] *State ex rel. Cass Cnty. v. Pub. Serv. Comm'n*, 259 S.W.3d 544, 549 (Mo. App. W.D. 2008); *see also State ex rel. Union Elec. Co. v. Pub. Serv. Comm'n*, 770 S.W.2d 283, 285 (Mo. App. W.D. 1989) (describing the utility's certificate to construct an electric line as "a line certificate" and noting the authority for which was

---

[5] "Such rights and privileges include the provision, distribution, and sale of electricity." *State ex rel. Cass Cnty. v. Pub. Serv. Comm'n*, 259 S.W.3d 544, 548 (Mo. App. W.D. 2008).

[6] "Utility franchises are no more than local permission to use the public roads and right of ways in a manner not available to or exercised by the ordinary citizen." *State ex rel. Union Elec. Co. v. Pub. Serv. Comm'n*, 770 S.W.2d 283, 285 (Mo. App. W.D. 1989).

[7] We have noted that this terminology "is somewhat complicated by the fact that section 393.170 makes no reference to the erection of transmission lines, an activity that falls within the broad ambit of a utility's rights and privileges under its franchise." *State ex rel. Cass Cnty. v. Pub. Serv. Comm'n*, 259 S.W.3d 544, 549 n.6 (Mo. App. W.D. 2008); *see also Pub. Serv. Comm'n v. Kan. City Power & Light Co.*, 31 S.W.2d 67, 69-70 (Mo. banc 1930) (noting that the statute did not, by its express terms, require a CCN to construct a transmission line, but finding that "it was the intention of the Legislature to make such a requirement, [and] that intention should govern.").

contemplated in section 393.170.1). "Section 393.170.2 grants the Commission the authority to issue an area CCN for the utility to exercise a franchise and provide retail utility service to a geographic territory." *Grain Belt Express*, 555 S.W.3d at 471.

Although an electric utility generally must obtain a line CCN before building transmission lines, it need not do so if the utility is seeking to build or extend the transmission lines in "its certified area (i.e. the territory covered by its area [CCN])." *Cass Cnty.*, 259 S.W.3d at 549 n.6; *see also State ex rel. Harline v. Pub. Serv. Comm'n*, 343 S.W.2d 177, 185 (Mo. App. 1960); *cf. Pub. Serv. Comm'n v. Kan. City Power & Light Co.*, 31 S.W.2d 67, 71 (Mo. banc 1930). However, "[b]ecause the construction of a new power plant, even within a certified area, is governed by section 393.170.1, a utility may not rely solely upon its area certificate and must obtain a line certificate from the PSC before doing so." *Cass Cnty.*, 259 S.W.3d at 549 n.6; *see also Stopaquila.org v. Aquila, Inc.*, 180 S.W.3d 24, 35-39 (Mo. App. W.D. 2005).

With this background in mind, we turn to the Rule promulgated by the PSC. The stated purpose of the Rule is to "outline[] the requirements for applications to the commission, pursuant to section 393.170.1 and 393.170.2, RSMo, requesting that the commission grant a certificate of convenience and necessity to an electric utility for a service area or to operate or construct an electric generating plant, an electric transmission line,[8] or a gas transmission line that facilitates the operation of an electric generating plant." 4 CSR 240-20.045.

---

[8] By its plain terms, and contrary to the established law described above and the Rule's stated purpose, the Rule does not require that a utility obtain a CCN prior to constructing an electric transmission line outside its certified area, nor does the Rule require any specific information be included in such a CCN application. The Rule states a CCN is required for construction of an "asset" and contains requirements for a CCN application to construct an "asset," but does not define asset to include electric transmission lines. We note that plants and electric transmission lines are not one and the same. *See Stopaquila.org*, 180 S.W.3d at 36 (noting that the "terms 'electric plant' and 'transmission lines' are not synonymous under the Public Service Commission Law"); *Harline*, 343 S.W.2d at 183 (rejecting the argument that the definition of "electric plant" includes a "transmission line").

6

The Rule provides that an "electric utility must obtain a certificate of convenience and necessity prior to (1) Providing electric service to retail customers in a service area pursuant to section 393.170.2, RSMo; (2) Construction of an asset pursuant to section 393.170.1, RSMo; or (3) Operation of an asset pursuant to section 393.170.2, RSMo." 4 CSR 240-20.045(2)(A). The Rule defines "asset" as:

> 1. An electric generating plant, or a gas transmission line that facilitates the operation of an electric generating plant, that is expected to serve Missouri customers and be included in the rate base[9] used to set their retail rates regardless of whether the item(s) to be constructed or operated is located inside or outside the electric utility's certificated service area or inside or outside Missouri; or
>
> 2. Transmission and distribution plant located outside the electric utility's service territory, but within Missouri[.]

4 CSR 240-20.045(1)(A). The Rule defines "construction" as:

> 1. Construction of new asset(s); or
>
> 2. The improvement, retrofit, or rebuild of an asset that will result in a ten percent (10%) increase in rate base as established in the electric utility's most recent rate case[.]

4 CSR 240-20.045(1)(B). The Rule does not define "operation."

The Rule sets forth requirements applicable to all CCN applications, then provides for additional requirements depending on the type of CCN being applied for. The Rule states that its provisions "do not create any new requirements for or affect assets, improvements, rebuilds or retrofits already in rate base as of the effective date of this rule." 4 CSR 240-20.045(7).

---

[9] "A utility's rate base is the capital investment devoted to, and necessary for, providing reasonable adequate service to customers." *State ex rel. Mo. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 293 S.W.3d 63, 76 (Mo. App. S.D. 2009). "Rate base investments include power plants, transmission lines, office space for utility operations, and equipment with a useful life of one or more years." *Id.* "A utility company is entitled to a rate of return only on investments included in its rate base." *Id.*

The prior regulation at 4 CSR 240-3.105, which was rescinded and replaced with the Rule, provided separate CCN application requirements for "a service area" and for "electrical transmission lines, gas transmission lines or electrical production facilities." The prior regulation did not contain the term "operation" or "asset," and did not define the term "construction."

**Analysis**

*The Order of Rulemaking Is Unlawful (Points I, II, and III)*

In their first three points, KCP&L and GMO argue that the Rule is unlawful because it imposes requirements that are not authorized under Missouri statutory law. We discuss each point in turn.

Point I – Operation of an Asset

In their first point, KCP&L and GMO argue that the PSC "erred in promulgating the Rule . . . because it has no statutory authority to require an electric utility to obtain a [CCN] prior to the 'operation of an asset' in that Section 393.170.2 does not require an electric utility to obtain a CCN to operate an asset."

This point specifically focuses on 4 CSR 240-20.045(2)(A)3, which requires an electric utility obtain a CCN prior to "[o]peration of an asset pursuant to section 393.170.2, RSMo." Based on our interpretation of section 393.170.2, however, we hold that it does not include a requirement that an electric utility obtain a CCN in order to operate an asset.

Again, subsection 2 of section 393.170 provides that, "[n]o [electrical] corporation shall exercise any right or privilege under any franchise . . . without first having obtained the permission and approval of the commission." "Subsection 2 sets out the requirement for authority to serve a territory which is known as an area certificate." *Union Elec. Co.*, 770 S.W.2d at 285. An area certificate is "the principle vehicle for saturating a geographically defined area with retail electric

8

service." *Id.*; *see also Cass Cnty.*, 259 S.W.3d at 549 ("Permission to exercise a franchise by serving customers is generally granted in the form of an 'area certificate.'"). "Area certificates thus provide approval of the sort contemplated in subsection 2 of 393.170." *Cass Cnty.*, 259 S.W.3d at 549.

The Rule requires an electric utility obtain separate CCNs to "provid[e] electric service to retail customers in a service area pursuant to section 393.170.2" and to "operat[e] an asset pursuant to section 393.170.2." *See* 4 CSR 240-20.045(2)(A). Thus, the question we must resolve is whether the Rule's requirement that an electric utility obtain a separate CCN to operate an asset—in addition to its area CCN—is consistent with section 393.170.2. In accordance with our decisions in *State ex rel. Harline v. Public Service Commission* and *State ex rel. Cass County v. Public Service Commission*, we hold that it is not.

In *Harline*, the Kansas City Court of Appeals held that when a public utility holds an area certificate, the utility is not required to obtain an additional CCN to build or extend transmission lines in its certificated area. *See* 343 S.W.2d at 185. The court noted that, "[i]f additional commission authority other than the area certificate be necessary, such requirement must affirmatively appear in the statutes" and that no such requirement existed in section 393.170. *See id.* at 181, 185 (the utility's area CCN "conferred authority upon [the utility] to construct the proposed transmission line, and [] the law required no additional authorization from the Commission.").

In reaching its holding, the court rejected the notion that "the construction of a transmission line is the exercise of a 'right or privilege under any franchise,' prohibited without Commission approval," stating it did "not read the statute with that understanding." *Id.* at 183. Instead, the court viewed "the company's rights and privileges under its corporate franchise as the unitary,

indivisible sum of all its corporate powers conferred by the state, merged into the single privilege of operating an electric utility." *Id.* "If Commission approval were required for all separate acts in the exercise of 'any right or privilege under any franchise,'" the court "evisage[d] its ridiculous application to every conceivable detail incident to business operation." *Id.*

We find the reasoning articulated in *Harline* applies equally here, and conclude that, because the Rule would require a utility holding an area CCN pursuant to section 393.170.2 *additionally* obtain a CCN to operate an asset in its certificated area, the Rule would impose a regulatory condition in excess of those authorized by the General Assembly. The utility's area CCN confers upon it the authority to operate an asset, and section 393.170.2 requires no additional authorization from the PSC before the utility can operate that asset.

Our conclusion here is also consistent with our opinion in *Cass County*, the second appeal before this Court regarding Aquila's construction of a power plant without county or PSC authority. In the first appeal, *Stopaquila.org v. Aquila, Inc.*, we held that an electric utility, such as Aquila, is required to obtain a line CCN under section 393.170.1 to construct a power plant, even if the plant is located in the utility's certificated area. *See* 180 S.W.3d at 34 ("a Commission order granting a service territory to one utility does not function as the 'specific authority' required for the construction of an electric plant under section 393.170.1"). We affirmed the circuit court's order permanently restraining construction of the power plant because Aquila had failed to obtain a line CCN authorizing the plant's construction. *See id.* at 41.

After that decision, the PSC issued a line CCN to Aquila authorizing construction of the plant and Cass County appealed. *See Cass Cnty.*, 259 S.W.3d at 546. We reversed the PSC's order granting the CCN, holding that the PSC lacked statutory authority to grant a *post hoc* CCN approving construction of a power plant already built. *See id*. We found that the plain terms of

10

section 393.170 required that approval for construction of power plants be sought and given before construction. *See id.* at 549. As relevant here, we noted that although Aquila did not have a valid CCN to construct the electric plant, Aquila did not need a "new CCN to *operate* the [plant], as its existing area certificate confer[red] that authority." *Id.* at 550 (emphasis added). In other words, we specifically held that Aquila's area certificate provided the necessary authority to operate the plant, which is the same conclusion we reach here: that an area certificate issued pursuant to section 393.170.2 allows for the operation of an asset in the certificated area without any additional authorization from the PSC.

"It is axiomatic that rules of the Commission must be consistent with and subject to statutes adopted by the General Assembly." *Philipp Transit Lines*, 523 S.W.2d at 356; *see also State ex rel. Springfield Warehouse & Transfer Co. v. Pub. Serv. Comm'n*, 225 S.W.2d 792, 794 (Mo. App. 1949) (The PSC "has no power to adopt a rule" which "results in nullifying the expressed will of the Legislature" and "cannot, under the theory of 'construction' of a statute, proceed in a manner contrary to the plain terms of the statute.").

Here, we find the Rule's requirement that an electric utility must obtain an additional CCN specifically to operate an asset exceeds the requirements of state law, and is therefore unlawful and invalid. *See Philipp Transit Lines*, 523 S.W.2d at 356-57 (rule promulgated by the PSC was unlawful and unenforceable because it imposed a requirement not found in the statute). Point I is granted.

<u>Point II – Construction of an Asset</u>

In their second point, KCP&L and GMO argue that the PSC "erred in promulgating the Rule . . . because it has no statutory authority to require an electric utility to obtain a CCN prior to the improvement, retrofit or rebuild of an electric plant for which a CCN has already been granted,

or the construction of a plant where a multi-unit CCN was previously granted in that Section 393.170.1 only requires a public utility to obtain a CCN to begin construction of an electric plant."

This point specifically focuses on 4 CSR 240-20.045(2)(A)2, which requires that an electric utility obtain a CCN prior to "[c]onstruction of an asset pursuant to section 393.170.1, RSMo;" 4 CSR 240-20.045(1)(A), which defines "asset" to include "[a]n electric generating plant, or a gas transmission line that facilitates the operation of an electric generating plant"; and 4 CSR 240-20.045(1)(B), which defines "construction" as "[c]onstruction of new asset(s)" or "[t]he improvement, retrofit, or rebuild of an asset that will result in a ten percent (10%) increase in rate base as established in the electric utility's most recent rate case." We must decide whether these provisions of the Rule exceed the statutory authority afforded the PSC by section 393.170.1.

Section 393.170.1 states that no electrical corporation "shall begin construction of a[n] . . . electric plant" without PSC approval. "Construction" is not defined in Chapter 386 or 393. However, it is settled that the phrase "begin construction of an electric plant" includes, at a minimum, the initial construction of a new electric plant. *See Stopaquila.org*, 180 S.W.3d at 34. The issue presented by the Rule is whether the phrase "begin construction of an electric plant" includes improvements to, the retrofitting of, or the rebuilding of, an existing electric plant where a 10% increase in rate base will result.

In interpreting a statute, we seek to give effect to legislative intent. *Id.* at 29. "We look first to the plain and ordinary meaning of the words used to discern legislative intent and will only look past the plain and ordinary meaning when statutory language is ambiguous or leads to an illogical result." *Id.* "Moreover, we do not read the provisions of a legislative act in isolation; we look as well to the provisions of the whole law, including its object and policy, to harmonize all of the

provisions, if possible, and consider statutes involving similar or related subject matter to shed light on the meaning of the statute being construed." *Id.*

Section 393.170 was enacted to address market concerns unique to utilities, namely that overcrowding in the field is detrimental to rate paying customers, but allowing a utility to hold a monopoly is equally problematic. *See State ex rel. City of Sikeston v. Pub. Serv. Comm'n*, 82 S.W.2d 105, 110 (Mo. 1935) ("The Public Service Commission Law was intended to prevent overcrowding of the field in any city or area and thus restrain cut-throat competition upon the theory that it is destructive, and that the ultimate result is that the public must pay for that destruction."); *see also State ex rel. Barker v. Kan. City Gas Co.*, 163 S.W. 854, 857-58 (Mo. 1913) (The policy behind the Public Utilities Act recognizes "certain generally accepted economic principles," such as a public utility "is in its nature a monopoly; that competition is inadequate to protect the public, and, if it exists, is likely to become an economic waste; [and] that state regulation takes the place of and stands for competition[.]").

Section 393.170 addresses these concerns by requiring PSC authorization before a utility begins business in the state or before an established utility moves into a new territory. *See City of Sikeston*, 82 S.W.2d at 110 (To "prevent overcrowding of the field," the PSC "was given the authority to pass upon the question of public necessity and convenience for any new or additional company to begin business anywhere in the state, or for an established company to enter new territory."); *see also Harline*, 343 S.W.2d at 182 (characterizing the PSC's powers under section 393.170 as: "to pass upon the question of public necessity and convenience (1) for any new company or additional company to begin business anywhere in the state, or (2) for an established company to enter new territory." (citing *Peoples Tel. Exch. v. Pub. Serv. Comm'n*, 186 S.W.2d 531, 538 (Mo. App. 1945))). The PSC was given these powers "in 1913 by the enactment of present

13

Section 393.170, which has since remained in effect, without change."[10] *Harline*, 343 S.W.2d at 182. Beginning business in a new territory within the state thus requires an area certificate as contemplated by section 393.170.2. However, even with an area certificate, the General Assembly saw fit to require an electric utility to secure an additional CCN before beginning construction of an electric plant. § 393.170.1; *Stopaquila.org*, 180 S.W.3d at 34. And the General Assembly directed the PSC to determine, as a condition of issuing any such line certificate, whether "such construction . . . is necessary or convenient for the public service." § 393.170.3.

With respect to energy generating plants, "necessity" refers to whether existing generating plants are sufficient to meet anticipated future demands, and to whether the cost to increase generating capacity can be justified. *See, e.g.*, *In re Application of KCP&L Greater Mo. Operations Co. for Permission & Approval of a Certificate of Pub. Convenience & Necessity Authorizing It to Construct, Install, Own, Operate, Maintain & Otherwise Control & Manage Solar Generation Facilities in W. Mo.*, 515 S.W.3d 754, 759-60 (Mo. App. W.D. 2016) (holding that "necessity" includes whether additional service would be important to public convenience and at a justifiable cost). Thus, a utility is prohibited by section 393.170.1 from beginning construction of an energy generating plant unless and until the PSC has determined pursuant to section 393.170.3 that the energy generating facility is necessary and convenient to meet the present and future energy consumption needs of those within the utility's certificated area, at a cost that can be justified. *See, e.g.*, *State ex rel. Intercon Gas, Inc. v. Pub. Serv. Comm'n of Mo.*, 848 S.W.2d 593, 597-98 (Mo. App. W.D. 1993) (holding that "necessary or convenient for public service" contemplates avoiding duplication of service, and where the need for the improvement to serve the public interest justifies the cost of the improvement).

---

[10] We note that, in 2018, the General Assembly amended section 393.170.1 to exclude from the CCN requirement the construction of energy generation units that have a capacity of one megawatt or less.

14

Given this legislative intent, the phrase "begin construction of an electric plant" must be construed to include not only the initial construction of a new electric plant, but also construction on existing plants intended to increase the plant's electric generating capacity. Were we to conclude otherwise, an electric utility would be required, for example, to secure a CCN before constructing a plant to increase its generating capacity at a new location, but would not be required to secure a CCN before undertaking construction on an existing plant to increase generating capacity. This result would be inconsistent with the General Assembly's intent to require the PSC's approval before an electric utility incurs the cost to construct energy generating plants that will increase the utility's energy generating capacity in its certificated area. *See Reichert v. Bd. of Educ. of St. Louis*, 217 S.W.3d 301, 305 (Mo. banc 2007) ("Construction of statutes should avoid unreasonable or absurd results.").

In view of our conclusion concerning the legislature's intended meaning of the phrase "begin construction of an electric plant," we find the Rule's requirement that a CCN be secured before the "improvement, retrofit, or rebuild of an asset that will result in a ten percent (10%) increase in rate base" exceeds the authority extended the PSC. As we have previously explained, "rate base" refers to "the capital investment devoted to, and necessary for, providing reasonable adequate service to customers." *State ex rel. Mo. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 293 S.W.3d 63, 76 (Mo. App. S.D. 2009). "Rate base investments include power plants, transmission lines, office space for utility operations, and equipment with a useful life of one or more years." *Id.* Although "rate base" includes the cost to construct plants, and thus the cost to construct a plant to increase energy generating capacity, the concept of "rate base" is far broader than that. In other words, an improvement, retrofit, or rebuild of an asset could result in an increase in rate base by 10% or more, but provide no increase in electric generating capacity. By requiring

15

an electric utility to secure a CCN for ***all*** improvements, retrofits, or rebuilds of an asset where the effect would be to increase rate base by 10% or more, including where the activity has no impact on energy generation, the PSC has imposed a broader requirement on utilities than is authorized by section 393.170.1.[11]

Accordingly, we find this provision of the Rule unlawful and invalid. *See Philipp Transit Lines*, 523 S.W.2d at 357 (rule promulgated by the PSC was unlawful and unenforceable because it imposed a requirement not found in the statute). Point II is granted.

Point III – Assets Located Outside Missouri

In their third point, KCP&L and GMO argue that the PSC "erred in promulgating the Rule . . . because it has no statutory authority to require an electric utility to obtain a CCN prior to the construction or operation of an electric plant or other asset that is not located in Missouri in that Section 386.250 limits the jurisdiction of the PSC to 'within the state.'"

This point specifically focuses on 4 CSR 240-20.045(1)(A)1, which defines an asset as "[a]n electric generating plant, or a gas transmission line that facilitates the operation of an electric generating plant, that is expected to serve Missouri customers and be included in the rate base used

---

[11] Although statutes enacted in other states regarding CCNs are not binding upon us and do not necessarily speak to the Missouri General Assembly's intent in enacting section 393.170, we note that numerous states expressly provide for commission or board approval for all construction projects on existing plants, regardless whether intended to increase the plant's generating capacity. *See, e.g.*, 220 Ill. Comp. Stat. Ann. 5/8-503 (West 2007) (Illinois statute providing for commission approval of "additions, extensions repairs or improvements to, or changes in, [an] existing plant, equipment, apparatus, facilities or other physical property of any public utility"); Iowa Code Ann. § 476A.2 (West 2001) (Iowa statute providing that "[a]ny significant alteration, as determined by the board, in the location, construction, maintenance, or operation of a facility . . . shall require an application for an amendment to a certificate or a certificate, whichever is appropriate."); N.D. Cent. Code Ann. § 49-05-16 (West 2013) (North Dakota statute allowing public utilities to obtain an advance determination of prudence from the commission before making a "resource addition," which is defined as "construction, modification, purchase, or lease of an energy conversion facility, renewable energy facility, demand response system, transmission facility, or a contract to acquire energy, capacity, or demand response for the purpose of providing electric service."). If the Missouri General Assembly were to require public utilities obtain PSC approval for all construction projects on existing assets, regardless whether the intent is to increase generating capacity, there are many statutory models available for our legislature's consideration.

16

to set their retail rates regardless of whether the item(s) to be constructed or operated is located inside or outside the electric utility's certificated service area or inside or outside Missouri[.]"

Section 386.250 provides that the "jurisdiction, supervision, powers and duties of the [PSC] herein created and established shall extend under this chapter . . . [t]o the manufacture, sale or distribution of gas, natural and artificial, and electricity for light, heat and power, within the state, and to persons or corporations owning, leasing, operating or controlling the same; and to gas and electric plants, and to persons or corporations owning, leasing, operating or controlling the same[.]" § 386.250(1).

In arguing that the PSC has no jurisdiction to regulate a utility's actions outside the state, KCP&L and GMO only focus on the first clause of section 386.250(1), which extends PSC jurisdiction to "the manufacture, sale or distribution of . . . electricity for light, heat and power, *within the state*, and to persons or corporations owning, leasing, operating or controlling the same[.]" (emphasis added). They ignore, however, the second clause of section 386.250(1), which provides that the PSC's jurisdiction applies to "electric plants, and to persons or corporations owning, leasing, operating or controlling the same," and which does not limit such jurisdiction to "within the state."

"When interpreting a statute, each word, clause, sentence, and section of a statute should be given meaning." *State v. Richey*, 569 S.W.3d 420, 423 (Mo. banc 2019). "[W]here different language is used in the same connection in different parts of an act, it is presumed that the legislative body intended different meaning and effect." *McAlister v. Strohmeyer*, 395 S.W.3d 546, 552 (Mo. App. W.D. 2013); *see also Armco Steel v. City of Kan. City Mo.*, 883 S.W.2d 3, 7-8 (Mo. banc 1994) (Where certain subsections in the statute referred to "county collectors" and others

17

referred only to "collectors," the terms were not interchangeable, and where the statute referenced only "collectors" it intended to include city and municipal collectors.).

Considering these principles of statutory interpretation, we turn back to subsection 1 of section 386.250. The first clause of the subsection limits the PSC's jurisdiction to "within the state," but the second clause does not. *Cf. Blue Cross & Blue Shield of Kan. City, Inc. v. Nixon*, 26 S.W.3d 218, 233-34 (Mo. App. W.D. 2000) (In statutory construction, "[t]he last antecedent rule generally requires that relative and qualifying words, phrases or clauses must be applied to the words, phrases or clauses immediately preceding and are not to be construed as extending to or including others more remote."). The fact that the legislature limited the PSC's jurisdiction relating to the "manufacture, sale or distribution" of "electricity for light, heat and power" to *within the state*, but did not include similar limiting language regarding the PSC's jurisdiction over "electric plants," must be given meaning. We find, therefore, that section 386.250(1) does not limit the PSC's jurisdiction over "electric plants, and to persons or corporations owning, leasing, operating or controlling the same" to within the state of Missouri.[12]

That does not mean, however, that the Rule's definition of "asset" entirely survives challenge. The Rule defines "asset" to include an out-of-state "gas transmission line that facilitates the operation of an electric generating plant." Section 386.250(1) expressly limits the PSC's jurisdiction regarding the "distribution" of electricity to "within the state." Additionally, an "electric plant" is not the same as a "transmission line." *See Stopaquila.org*, 180 S.W.3d at 36-37 (noting that the "terms 'electric plant' and 'transmission lines' are not synonymous under the

---

[12] We disagree with KCP&L and GMO's argument that past practice of the PSC indicates it does not have jurisdiction over out-of-state plants. The PSC's failure to previously exercise the authority given to it by statute does not mean the authority does not exist. And the PSC's historical treatment of utilities does not mandate such treatment continue. *See Stopaquila.org*, 180 S.W.3d at 37 (holding the PSC's long-time practice of allowing construction of electric plants in a utility's certificated area without a line CCN violated section 393.170 and thus was impermissible).

18

Public Service Commission Law"); *Harline*, 343 S.W.2d at 182 (rejecting the argument that the definition of "electric plant" includes a "transmission line"). Accordingly, although we find the PSC's jurisdiction extends to an out-of-state "electric generating plant . . . that is expected to serve Missouri customers and be included in the rate base used to set their retail rates," we find it does not extend to an out-of-state "gas transmission line that facilitates the operation of an electric generating plant, that is expected to serve Missouri customers and be included in the rate base used to set their retail rates." Thus, the Rule's requirement that electric utilities obtain a CCN prior to construction of an out-of-state gas transmission line exceeds the jurisdictional reach granted the PSC by the General Assembly.[13]

By determining the extent of the PSC's out-of-state jurisdiction under section 386.250, we have addressed the only argument raised by KCP&L and GMO in this point relied on. In the argument section of their brief, however, they raise an alternative ground for finding the PSC has no jurisdiction outside Missouri: that the exercise of such jurisdiction would be prohibited under federal law. Specifically, they argue that the "Rule's application to out-of-state activity is also a violation of the Commerce Clause of the U.S. Constitution." Although KCP&L and GMO have not properly preserved this argument for appeal, we will, *ex gratia*, exercise our discretion to provide substantive analysis of their argument and address this constitutional concern. *See Guthrie v. Mo. Dep't of Labor & Indus. Relations*, 503 S.W.3d 261, 270 n.7 (Mo. App. W.D. 2016).

"The Commerce Clause of the United States Constitution states that 'Congress shall have the Power . . . to regulate Commerce . . . among the several states.'" *Waste Sys. Corp. v. Cnty. of*

---

[13] Though not expressly raised as an issue on appeal, the definition of "asset," which includes "gas transmission line that facilitates the operation of an electric generating plant," is subject to an even more fundamental challenge, at least insofar as the Rule's requirement that construction of all new assets requires a CCN pursuant to section 393.170.1. Section 393.170.1 does not make reference, of course, to gas transmission lines that facilitate the operation of an electric plant. Because this issue has not been raised as a point on appeal, we need not resolve whether the reference to "electric plant" in section 393.170.1 can be construed to include a gas transmission line that facilitates the operation of an electric plant.

*Martin, Minn.*, 985 F.2d 1381, 1385 (8th Cir. 1993) (quoting U.S. Const. art. 1, § 8). "The Supreme Court has also recognized a 'dormant' component to the Commerce Clause: in absence of express regulation from Congress, the clause acts as a limitation on a state's power to discriminate against interstate commerce." *Id.* "When a regulation treats inter- and intrastate commerce evenhandedly in order to accomplish a legitimate local public interest and any corresponding effects on interstate commerce are incidental, the regulation does not violate the Commerce Clause unless the burden imposed on interstate commerce is excessive in relation to the local benefits." *Id.*

Requiring a utility obtain a CCN prior to construction of an out-of-state "electric generating plant . . . that is expected to serve Missouri customers and be included in the rate base used to set their retail rates" does not impose a burden on interstate commerce that is excessive in relation to the local benefits. Under the Rule, an electric utility may build an out-of-state plant without any authorization from Missouri; it is only the utility's intent to use that plant to serve Missouri customers and to include it in their rate base that triggers the CCN requirement. If the PSC were to find that such plant was not necessary or convenient for Missouri ratepayers, the utility would not be prohibited from building it; it would simply be unable to recover the associated costs in its Missouri rate base. Nor is the PSC usurping another state's authority, as the state in which such plant is located is still wholly free to regulate the construction of that electric plant as it deems appropriate. We do not find any violation of the dormant Commerce Clause here.[14]

---

[14] Because we find the Rule does not violate the Commerce Clause, section 386.030 is not implicated. Section 386.030 provides that,"[n]either this chapter, nor any provision of this chapter, except when specifically so stated, shall apply to or be construed to apply to . . . commerce among the several states of this union, except insofar as the same may be permitted under the provisions of the Constitution of the United States and the acts of Congress." The Missouri Supreme Court has held that section 386.030 merely reflects the understanding of the Missouri legislature that "those powers granted to the PSC by Missouri statute are limited by the doctrine of preemption as to matters affecting interstate commerce." *State ex rel. MoGas Pipeline, LLC v. Mo. Pub. Serv. Comm'n*, 366 S.W.3d 493, 496 (Mo. banc 2012). As discussed above, the Rule's requirement that utilities obtain a CCN prior to constructing out-of-state electric plants that are expected to serve Missouri customers and be included in the rate base used to set their retail rates does not violate the Commerce Clause.

In sum, Missouri statutes confer upon the PSC the authority to regulate an out-of-state "electric generating plant . . . that is expected to serve Missouri customers and be included in the rate base used to set their retail rates" in the manner provided for in the Rule. However, this authority does not extend to an out-of-state "gas transmission line that facilitates the operation of an electric generating plant, that is expected to serve Missouri customers and be included in the rate base used to set their retail rates." Accordingly, we find the Rule's requirement that electric utilities obtain a CCN prior to construction of an out-of-state gas transmission line unlawful and invalid. Point III is granted in part and denied in part.

<u>Conclusion as to the Order of Rulemaking's Lawfulness</u>

For the reasons stated above, we find contrary to state law the provisions of the Rule that:

- Require that an electric utility obtain a CCN prior to operation of an asset;

- Require that an electric utility obtain a CCN prior to the "improvement, retrofit, or rebuild of an asset that will result in a ten percent (10%) increase in rate base as established in the electric utility's most recent rate case"; and

- Require that an electric utility obtain a CCN prior to construction of an out-of-state "gas transmission line that facilitates the operation of an electric generating plant, that is expected to serve Missouri customers and be included in the rate base used to set their retail rates."

The Order of Rulemaking that promulgated the Rule is thus unlawful and is hereby vacated in its entirety. *See* § 386.510 ("[T]he court of appeal shall render its opinion either affirming or setting aside, in whole or in part, the order or decision of the commission under review."); *see also Parmley v. Mo. Dental Bd.*, 719 S.W.2d 745, 755 (Mo. banc 1986) ("When there is a direct conflict or inconsistency between a statute and a regulation, the statute which represents the true legislative intent must necessarily prevail" and the regulation "is a nullity.").

21

*The Rule's Fiscal Note*

In their final point, KCP&L and GMO argue that the PSC "erred in promulgating the Rule" in that its accompanying fiscal note did not comply with section 536.205, rendering the Rule void. However, based on our finding that the Order of Rulemaking shall be vacated as unlawful, we find it unnecessary to address this point.

## Conclusion

The Order of Rulemaking is hereby vacated.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.